220 A.2d 508.

STATE *vs.* WILLIAM A. BURKE.

JUNE 23, 1966.

PRESENT: Roberts, C. J., Paolino, Powers and Joslin, JJ.

POWERS, J. This indictment for kidnapping was tried to a superior court justice sitting with a jury who returned a verdict of guilty. The case is before us on the defendant's bill of exceptions to certain rulings made during the course of the trial.

The ultimate facts not in dispute establish that at or about 9:44 on the evening of October 9, 1964, officer Francis R. Labrie of the Smithfield police department received a radio call directing him to investigate an apparent breaking and entering of a First National store located on Putnam avenue in the village of Greenville. Arriving at the store officer Labrie observed defendant run from the rear of a parked car, enter it and drive off at high speed. The officer chased the car until, attempting to turn off Putnam avenue onto Greenville avenue, it struck a guy wire and stalled.

The defendant was out of the car when officer Labrie caught up with it. After threatening Labrie, defendant attempted to escape by running down an embankment into a body of water known as Hopkins Pond. After the officer had fired several shots and ordered defendant to surrender, the latter came out of the pond and was handcuffed by officer Labrie and officer Charles E. Gorman, Jr., who had joined in the pursuit.

Returning defendant to the car he had been driving, where a crowd had gathered, the police officers learned that there was someone in the trunk. Upon unlocking it they found Lionel C. Lamonde, grocery manager of the First National Store, bound hand and foot by two belts, head bleeding and in a dazed condition. He was treated by the rescue squad and later hospitalized. It was on his version of the events of the evening that the instant indictment was returned.

According to said manager, he transferred some $5,000 in bills, $3,500 in checks and $1,900 in change from the cash registers to the safe before closing the store on the evening of October 9, 1964. About ten minutes past nine that evening he and the meat manager secured the store for the night in keeping with company policy and then went to their respective cars which were the only ones remaining in the parking lot. The two men drove out of the parking lot together, Lamonde driving easterly along Putnam Pike while the meat manager drove in the opposite direction. Lamonde turned right on Greenville avenue, headed for his home in Warwick and proceeded along said avenue some two miles to route 5. He slowed up for the traffic signal and was turning to his right on route 5 when his car was bumped from the rear.

It is his testimony that before he could get out of his car to investigate the damage, defendant appeared at the driver's window, pointed a gun and ordered him to open the rear door, all doors being locked and windows up. There then follows a recital of how defendant got in the rear seat of Lamonde's car, hit him across the right side of the head with the gun and ordered him to turn around and drive in the direction of the store. Further, Lamonde recounted how he was made to stop in a dark spot in the highway, had his hands bound behind his head with his own belt, and with defendant driving returned to Putnam Pike where they turned east, thence to some dark road not known to Lamonde.

Continuing, Lamonde testified that he then, under threat of death, gave defendant the combinations of the safe after being struck on the right ear with the gun, and with his hands still bound by the belt was ordered out of the car. The defendant then unbound his hands only to rebind them again with Lamonde's belt, but this time with his arms behind and down rather than up behind the head. He was

then pushed to the rear and ordered into the trunk of the car after which defendant, as Lamonde says, "pulled out a belt from his possession that he had on him, and bound my feet, my legs, rather." The trunk was then closed and locked.

Lamonde described how the car was driven off, suddenly stopped, and the next thing of which he was aware was the breaking of glass. After some seven or ten minutes the car started up again and traveled at a fast rate of speed until it collided with something and stopped. He concluded by describing the commotion attendant upon defendant's apprehension up to Lamonde's release, as heard by him from the trunk of the car.

The defendant readily admitted breaking into the First National Store and driving Lamonde's car with the manager in the trunk away from the scene, but advanced a totally different version of the manager's role in the evening's events. Rather than being a coerced victim in defendant's single-handed efforts to rob the First National Store, Lamonde, according to defendant, was a fellow conspirator and locking him in the trunk with his arms and legs bound was part of an agreed plan designed to conceal the manager's participation.

It is defendant's testimony that on a Friday night in February 1964, he received an anonymous telephone call at a social club in Providence and the caller asked if he were "William or Billy Burke" who had spent time in prison. Receiving an affirmative answer the caller then asked if he would like to make some money. The defendant thought that someone was playing a practical joke and apparently closed the conversation.

Later, according to defendant, he received another such call at the same club in the last week of March or the first week of April and still another on a Friday night the first week in May. This latter call resulted in defendant meeting

the caller at about half past nine that evening. This meeting allegedly took place at the junction of routes 5 and 6 in the town of Johnston and the caller, so defendant says, proved to be manager Lamonde whom defendant consistently referred to as "Louie."

Continuing, defendant related how Lamonde told him of his position as manager, that he was ready to retire, and that "he wanted to take something with him." Out of this alleged conversation plans were made for defendant to rob the store after the closing hour on the night of Friday, October 9, 1964. This night was chosen because it coincided with heavy shopping for the long holiday weekend. The defendant's testimony on the details of the conspiracy attributed the bumping of cars at the intersection of Greenville avenue and route 5 and getting together at that spot as an arrangement insisted upon by Lamonde.

The defendant's version includes another meeting with Lamonde on a Friday night in August. It also took place at the junction of routes 5 and 6 and was the result of a telephone call from defendant to the manager. He made this call, defendant narrates, because he had been told by his brother of a telephone call by someone named "Louie" who was looking for defendant. References as to what supposedly transpired at this August meeting are vague and contradictory, but a fellow truck driver and member of the union local to which defendant belonged corroborated defendant's testimony of such a meeting. This witness stated that he heard none of the conversation but identified Lamonde as the person with whom defendant met.

The defendant's first exception is to the ruling of the trial justice made in connection with the testimony of defendant's brother concerning the telephone call which resulted in the alleged meeting in August. The brother testified that on a Friday night in August while he was at the social club frequented by defendant, a telephone call came

in for "Burke." Upon taking the call the brother learned that it was for defendant. The unknown caller's conversation was ruled inadmissible as hearsay by the trial justice, and although an exception was taken to this ruling it is not before us, having been neither briefed nor argued. *Winslow* v. *Einhorn*, 62 R. I. 1.

However, counsel for defendant then asked, "And what command did you give your brother Bill after receiving this telephone call?" Objection was made by the state and the trial justice sustained it. Exception to this ruling was taken and defendant offered to prove that the witness, if permitted to answer, would say, "Call Louie."

The defendant contends, in substance, that the ruling of the trial justice was prejudicial for the reason that the defense to kidnapping was based on the alleged victim's participation in a conspiracy and that there was extrinsic evidence sufficient to identify Lamonde as "Louie." Simply repeating the message, defendant contends, was not hearsay and should have been admitted in the posture it was offered.

Whether the exclusion was error, however, we need not inquire since it was not prejudicial. The defendant was permitted thereafter without objection to testify that from what his brother told him, he concluded that the caller had been Lamonde and defendant's alleged subsequent call to him confirmed such conclusion. His testimony in this regard in both direct and cross examinations, relative to the call allegedly received by his brother, effectively cured any possible prejudice which might have resulted from the ruling to which exception was taken. See *Smith* v. *Pendleton*, 53 R. I. 79, *Hargraves* v. *Ballou*, 47 R. I. 186, and *Warren* v. *Warren*, 33 R. I. 71.

The defendant's second exception is likewise without merit. It is predicated on the trial justice's refusal to permit defendant, while under redirect examination, to try on one of two belts in evidence. The belt that manager Lamonde

was wearing and with which his hands were bound had been admitted into evidence as state's exhibit 3. The other was in evidence as state's exhibit 4.

This latter belt, used to bind Lamonde's legs, had been testified to by Lamonde as a belt which defendant had in his possession. Lamonde's testimony in this regard is somewhat open to the interpretation that defendant had been wearing it. Counsel for defendant therefore in requesting that defendant be permitted to try on the proffered belt apparently intended to demonstrate that the belt did not fit defendant. The thrust of such demonstration clearly then was to cast doubt on Lamonde's story of having been kidnapped.

However, in proffering one of the two belts in evidence to defendant, counsel omitted referring to it as exhibit 4. Not being properly identified, the trial justice properly refused to permit the proposed demonstration. If the proffered belt were in fact state's exhibit 3, demonstrating that it did not fit defendant would not have been probatively related to the testimony sought to be rebutted. It is fundamental that where a specific exhibit is to be used for the purpose of rebutting specific testimony, the exhibit thus relied upon must be clearly identified as that which relates to the testimony sought to be impeached.

After the trial justice, for the reason noted, had refused to permit the demonstration, counsel for defendant called upon Lamonde to try on state's exhibit 4. In this instance, the belt to be used was properly identified. Lamonde complied and at the request of defendant's counsel afforded the jury an opportunity to observe the fit. Defense counsel then stated, "May the record reflect that State's Exhibit No. 4 fits Mr. Lamonde perfectly."

The assistant attorney general objected, and after instructing the jury to ignore counsel's conclusive statement

the court ruled that it should be stricken and defendant's exception noted.

The defendant argues that this was prejudicial for the reason that since state's exhibit 4 fitted Lamonde his testimony as to having been kidnapped was effectively impeached. Although on the state of the record such contention is far from established, defendant was not prejudiced even if the demonstration proved everything that he expected of it. It was for the jury to make such determination and they were afforded a full opportunity to do so. Counsel's conclusions, first that the belt fit Lamonde perfectly and, secondly, that Lamonde was therefore not to be believed, constituted an invasion of the jury's prerogatives.

In the course of his argument to the jury, the assistant attorney general commented, "Where is the gun? I know it's in the mud at the bottom of Hawkins Pond." Thereupon counsel for defense had the objectionable comment made a part of the record and moved that the case be passed. His final exception is to the denial of that motion. Although Lamonde testified that defendant used a gun and officer Labrie testified that before fleeing into the pond defendant insinuated that he had and appeared to have a gun, no weapon was ever found, even though the pond had been dragged.

The trial justice in denying defendant's motion took the position that the assistant attorney general was not attempting to alter the evidence but rather suggesting an inference which might be drawn from all the evidence in the case. Nevertheless he at that time and later in his charge instructed the jury that argument of counsel is not evidence. In denying the motion he also instructed the jury to ignore the comment upon which the defendant based his motion. In our judgment the trial justice's decision on the motion does not constitute grounds for a new trial. Any prejudice to the defendant arising out of the comment when

made was effectively cured by the trial justice's instructions to the jury at the time objection was made. In *State* v. *Farr*, 29 R. I. 72, commenting on the effect of similar instructions as were given in the instant case, this court stated at page 79: "If the court had complied with the request the incident would have been closed, for it is to be presumed that the jury would have obeyed the instructions of the court."

The defendant's exceptions briefed and argued are overruled, and the case is remitted to the superior court for further proceedings.

*J. Joseph Nugent*, Attorney General, *Corinne P. Grande*, Special Assistant Attorney General, for State.

*Cohen & Chaika, William Young Chaika*, for defendant.